IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWARD S. BAIM, et al.,

*Plaintiffs,*

v.

JOEL DUKART, et al.,

*Defendants.*

CIVIL ACTION
NO. 21-1696

**PAPPERT, J.**                                                    **March 2, 2023**

<u>**MEMORANDUM**</u>

Edward Baim owned and operated numerous McDonald's franchises over the course of fifty years.  This lawsuit concerns the last seven restaurants Baim owned before retiring.  Three of them were in New Jersey and four in Philadelphia and an adjacent county.  In the fall of 2019, he sold the three New Jersey franchises to an entity owned by Grant and George Skylass, fellow McDonald's franchise owners.  The Skylasses wanted Baim's entire portfolio, to include the Philadelphia stores, which Baim at that point was unwilling to sell.  So the parties compromised and, as part of his agreement to sell the New Jersey restaurants, Baim granted the Skylasses a right of first refusal on the Philadelphia stores.  As a result, if Baim decided to sell those last four locations, the Skylasses had the right to match any offer Baim received.  If they did, Baim was required to sell the restaurants to the Skylasses.

Within a year it became a seller's market for McDonald's franchises and Baim decided the time was right to retire.  He told the Skylasses he was now ready to sell the Philadelphia stores.  Unwilling to bid against themselves, the Skylasses told Baim to

1

put the restaurants on the market and bring them any offer he received.  Around that time, Joel and Michael Dukart contacted Baim.  Baim was a longtime friend of the Dukart family, having for years known Joel and Michael's father and uncle, themselves former franchisees in Delaware.  Baim told the Dukarts the Skylasses had the right of first refusal on his remaining stores but asked them to make him an offer.  The Dukarts, who very much wanted to expand into Philadelphia, were willing to be stalking horses if it meant there was a chance they could get Baim's stores.  Besides, given their family's longtime relationship with Baim, they were hopeful that, all things being equal, "Eddie" would want to sell them the restaurants.

Baim, obviously seeking the best deal possible, now had two potential suitors.  To make sure he didn't run afoul of his obligations to the Skylasses, he sent them anything that could be perceived as an offer, including preliminary letters of intent he received from the Dukarts.  That is where a previously straightforward situation began to get a little tricky.  The Skylasses purported to exercise their right of first refusal on a letter of intent from the Dukarts that was silent on certain key terms.  For example, Baim wanted a larger deposit at closing than the Skylasses wanted to pay.  The Dukarts were willing to give Baim everything he wanted.

Baim told the Dukarts he needed their full terms in writing so he could send the complete offer to the Skylasses and get their final answer.  The Skylasses threatened to enjoin any deal with the Dukarts if their right of first refusal wasn't honored.  The Dukarts, always hopeful the Skylasses would walk away or not be able to do the deal, signed a Purchase and Sale Agreement with Baim that both parties knew would only be valid if the Skylasses didn't want or couldn't afford the restaurants.

2

But the Skylasses matched the Dukarts' terms, and Baim signed a contract to sell them the restaurants.  The Dukarts hung around until the Skylass deal was finalized so they'd be first in line if it fell through.  When it became clear they weren't getting the stores, the Dukarts asked Baim to pay a "breakup fee" that would at least reimburse them for their deal expenses.  Baim, a businessman to the end notwithstanding past family friendships, offered them five or ten thousand dollars. Joel Dukart didn't think this was reasonable, but when he pushed back, Baim told him to "do what you got to do, kiddo."  (Trial Tr. Day 1 95:12–13.)  Baim's condescending statement insulted the Dukarts and when they still hadn't received what they thought was a reasonable breakup fee five months after losing the deal, they threatened to sue. Baim was confident he did nothing wrong and wanted to make the first move, so he sought a declaration from the Court blessing his sale of the Philadelphia restaurants to the Skylasses.  The Dukarts asserted counterclaims contending Baim breached his contract to sell them the stores.

The parties tried the case without a jury.  Baim, Joel and Michael Dukart, and Grant Skylass, among others, testified.  The Court fully credits Baim's testimony on all salient points of his transactions, and interactions, with the Skylasses and Dukarts.  By contrast, the Court gives the Dukart brothers' testimony very little weight. Neither of them were credible on many of the issues that mattered.  They were evasive.  They pretended not to remember things they could not have possibly forgotten, and their versions of events were inconsistent with documentary evidence and common sense.

The result in this case was pretty easy to reach, but the reasoning behind it doesn't take as short and straight a path as it should.  Sloppy drafting of the Purchase

and Sale Agreement between Baim and the Dukarts created ambiguities requiring the Court to consider parol evidence to determine the parties' intent.  After doing so and considering all other evidence, the credibility of the witnesses, and the parties' post-trial submissions (ECF 53, 54), responses (ECF 56, 57), and oral argument (ECF 59), the Court finds that Baim properly honored his contractual obligations to the Skylasses and did not breach his agreement with the Dukarts.

## Findings of Fact

### I

### A

Edward Baim is a retired McDonald's franchisee who owned up to 22 restaurants over his fifty-year career. (Trial Tr. Day 1 9:25–10:17; Pl.'s FF&CL 2 ¶ 1.) Joel and Michael Dukart are current McDonald's franchisees and equal partners in their family's franchising business, which owns six McDonald's restaurants in Delaware.  (Trial Tr. Day 1 71:14–15, 72:6–17; Pl.'s FF&CL 2 ¶ 2; Def.'s FF&CL 1.)   The parties are family friends who met through the McDonald's community and go "back many years." (Trial Tr. Day 1 72:18–21; Pl.'s FF&CL 2 ¶ 3.)

On October 31, 2019, Baim, through entities he owned and controlled, agreed to sell three McDonald's restaurants in New Jersey to GNS Enterprises 6, LP, an entity ultimately owned by the Skylasses, other franchisees operating in the area.  (Trial Tr. Day 1 12:17–19, 114:22–116:3, 119:9–25, 135:4–8, 136:4–137:5; Pl.'s FF&CL 2 ¶ 4; Def.'s FF&CL 1; Ex. 1.)  In addition to these restaurants, Grant Skylass wanted to buy four more restaurants Baim owned, three in Philadelphia and the fourth in a county

adjacent to the city.[1]  (Pl.'s FF&CL 2 ¶ 5; Def.'s FF&CL 1.)  Baim was unwilling to sell the Philadelphia restaurants at the time, but the Skylasses wanted them so badly that, as Grant Skylass testified, he agreed to "overpay substantially" for the right of first refusal and was prepared to walk away from the New Jersey deal without it.  (Trial Tr. Day 1, 138:3–14; Pl.'s FF&CL 2 ¶ 5.)

Baim ultimately agreed, and the right was included in Section 10.11 of the Purchase and Sale Agreement for the New Jersey restaurants (the "2019 Skylass Agreement").[2]  (Trial Tr. Day 1 138:3–19; Pl.'s FF&CL 2 ¶ 5; Def.'s FF&CL 1; Ex. 1.) The provision gave the Skylasses the right to purchase the Philadelphia restaurants on the same terms and conditions extended in any *bona fide* offer by another purchaser, so long they accepted those terms within 14 days of receiving the other offer:

> If . . . any BAIM ENTITY receives [an offer] for any one or more PHILADELPHIA RESTAURANT from anyone other than PURCHASER and desires to accept such offer, it must first give notice to PURCHASER of the proposed terms and conditions of the offer, including without limitation the purchase price, the proposed closing date and the conditions of closing (the "AGREEMENT TERMS").  Within 14 days of the date of the notice, . . . PURCHASER must notify Edward Baim of its agreement to purchase the restaurant on the AGREEMENT TERMS.  Otherwise, the BAIM ENTITY may sell the restaurant pursuant to [the offer].

(Trial Tr. Day 1 15:5–22; Ex. 1, § 10.11(b); Pl.'s FF&CL 2 ¶ 6.)

B

Less than a year after inking the 2019 Skylass Agreement, Baim learned from

---

[1]     Collectively referred to as the "Philadelphia restaurants," consistent with the parties' contractual language.

[2]     The Philadelphia restaurants were owned by the following entities, which were thus also parties to the 2019 Skylass Agreement: Castor & Aramingo, LLC; Oregon Avenue, LLC; 749 Lincoln Highway, LLC; and 9970 Bustleton, LLC.  *See* (Ex. 1 20–21).

another McDonald's franchisee that recent transactions had substantially increased the restaurants' value, so he decided to put his remaining stores up for sale.  (Trial Tr. Day 1 17:17–18:3; Pl.'s FF&CL 3 ¶ 9; Def.'s FF&CL 2.)  The Dukarts approached Baim in the summer of 2020 to discuss purchasing the stores, and by fall of 2020 they formally expressed interest in buying the portfolio.  (Trial Tr. Day 1 73:6–20; Pl.'s FF&CL 3 ¶ 10; Def.'s FF&CL 2.)  They proposed a sale price of $19 million plus an agreement to cover the expenses of a McDonald's-mandated modernization for one of the restaurants.  (Trial Tr. Day 1 77:6–10; Pl.'s FF&CL 3 ¶ 10; Def.'s FF&CL 2.)  Baim was open and honest with the Dukarts from the very beginning.  (Pl.'s FF&CL 3 ¶ 11; Def.'s FF&CL 2.)  He told them the Skylasses had the right of first refusal on the restaurants and gave them the financial information necessary to formulate their offer.  (Trial Tr. Day 1 20:4–19,  73:23–74:8,  153:17–22, 177:15–21; Pl.'s FF&CL 3 ¶ 11; Def.'s FF&CL 2.)

The Dukarts conducted their due diligence and ultimately sent Baim a draft Letter of Intent, dated October 3, 2020 ("Initial Letter of Intent"), outlining their proposed terms.  (Trial Tr. Day 1 21:5–23, 23:3–6; Ex. 2; Pl.'s FF&CL 4 ¶¶ 12–13.)  On or about October 9, 2020, Baim sent a signed, revised version of the Dukarts' Letter of Intent ("Revised Letter of Intent") to George Skylass because Skylass "had the right to purchase the restaurants under the right of first refusal from the previous agreement" they had.  (Trial Tr. Day 1 23:24–24:14; 85:10–12; Pl.'s FF&CL 3 ¶¶ 14–15; Def.'s FF&CL 5; Ex. 3, 4.)  Joel Dukart knew Baim did so but wished the proposed deal could have been kept "quiet" until later in the process.  (Trial Tr. Day 1 85:10–12; 86:3–10.) On October 16, the Skylasses' lawyer sent Baim a letter telling him the Skylasses

6

were exercising the right of first refusal to buy the restaurants on the terms proposed
by the Dukarts. (Def.'s FF&CL 6; Ex. 5.) By this point, the Dukarts knew the
Skylasses were interested in matching their offer for the Philadelphia stores. (Trial
Tr. Day 1 28:20–29:8; Pl.'s FF&CL 4 ¶ 17; Def.'s FF&CL 6.)

The Revised Letter of Intent did not, obviously, address every term in detail.
*See* (Ex. 5.) Despite the Skylasses' intention to buy the restaurants, disputes quickly
arose over certain omitted terms, most notably the amount of the deposit required at
closing. (Trial Tr. Day 1 110:13–111:3, 143:19–145:8; Pl.'s FF&CL 4 ¶ 18; Def.'s
FF&CL 7.) This placed Baim in a difficult position. On one hand, he was negotiating
with the Dukarts, who were motivated buyers and ready to close. On the other, he
was required to honor the Skylasses' rights, allow them to vet the terms of the
Dukarts' offer and, if they wanted to match the terms, sell the Skylasses the
restaurants. Adding some time pressure, Baim was trying to avoid possible changes
to the tax code that could arise after the November 2020 elections, and McDonald's
Corporate Offices required that proposed franchise sales be submitted by November
1, 2020 for approval by year-end. (Trial Tr. Day 1 31:14–23; 34:21–35:4; Def.'s
FF&CL 7.)

Baim told the Dukarts that although the Skylasses had purportedly exercised
their right to buy the restaurants, there was a chance they would not be able to
complete the purchase. (Trial Tr. Day 1 28:20–29:8; Pl.'s FF&CL 5 ¶ 19; Def.'s
FF&CL 7.) Baim and the Dukarts decided to continue negotiating an agreement of

sale to solidify terms and see whether the Skylasses could obtain financing.[3] (Trial Tr. Day 1 28:5–29:8; Pl.'s FF&CL 5 ¶ 20; Def.'s FF&CL 8.) But the Skylasses did not view themselves as a backup plan. They were determined to get the restaurants they previously paid a premium for the right to buy. (Pl.'s FF&CL 5 ¶ 20; Def.'s FF&CL 7.) They hired a lawyer to threaten litigation to enforce that right and demanded that Baim sell them the Philadelphia restaurants, disagreements on key terms notwithstanding. (*Id.*; Trial Tr. Day 1 104:23–105:18; Ex. 9.)

Determined to meet McDonald's year-end deadline, and hoping to force the Skylasses' hand, Baim, the Dukarts and their respective lawyers convened on October 30, 2020 for final negotiations and to execute a Purchase and Sale Agreement (the "Dukart Agreement"). (Trial Tr. Day 1 35:7–11, 157:22–25; Pl.'s FF&CL 5 ¶¶ 22–23; Def.'s FF&CL 8.) The parties were at Baim's house with all counsel on speaker phone. (*Id.*; Trial Tr. Day 1 35:7–16.) They discussed, among other things, the Skylasses' right of first refusal and their threats to sue. (Trial Tr. Day 1 35:21–36:6; 158:1–19; Pl.'s FF&CL 5 ¶ 23; Def.'s FF&CL 8.)

II

The Dukart brothers testified, albeit reluctantly, that they knew, prior to signing the Dukart Agreement, that (1) Baim could not sell them the Philadelphia restaurants if the Skylasses exercised their right to buy them and (2) the Skylasses had threatened litigation against the parties in the event anyone tried to prevent them from buying the stores. (Trial Tr. Day 1 35:7–36:17, 146:3–21, 158:7–19, 160:8–16, 161:20–162:3, 173:1–18; Trial Tr. Day 2 29:10–13, 31:20–33:5; Pl.'s FF&CL 5 ¶ 24; Def.'s FF&CL 1,

---

[3]    Both parties now concede the Letters of Intent were not *bona fide* offers. (Def.'s FF&CL 15; Oral Arg. Tr. 4:13–17; 5:24–6:13.)

7.)  Just before the parties signed the Dukart Agreement, the Dukarts' lawyer sent an email to Baim's attorney confirming the parties' understanding that Baim would send Skylass the signed Dukart Agreement.  (Trial Tr. Day 1 37:14–38:4; Pl.'s FF&CL 6 ¶ 26; Def.'s FF&CL 8–9; Ex. 11.)  And everyone knew the Skylasses were threatening to sue—the Dukarts demanded to be protected if they did.  Their lawyer's email also said: "[i]n the event Skylass [sic] files suit against Baim and/or Dukart, then Baim agrees to (a) provide a defense to the litigation for Dukart at his cost; and (b) hold Dukart harmless from any loss, liability, or cost arising out of or incurred in connection with such litigation."  (Trial Tr. Day 1 158:7–19, 159:2–17, 160:8–20, Pl.'s FF&CL 6 ¶ 26; Def.'s FF&CL 9; Ex. 11.)

After covering these bases, the parties agreed they needed to sign the Dukart Agreement that afternoon to meet McDonald's November 1 deadline.  (Trial Tr. Day 1 36:7–12; 88:6–89:1; Trial Tr. Day 2 20:6–9.)  They did so at approximately 4:00 p.m. on October 30.  (Trial Tr. Day 1 55:8–10; 87:6–10; Def.'s FF&CL 8.)  Baim then sent the Agreement to the Skylasses, as he was required to do and as the Dukarts knew he would.  (Trial Tr. Day 1 56:15–57:8; Pl.'s FF&CL 6 ¶ 29; Def.'s FF&CL 8–9; Ex. 11; 12).  On November 3, the Skylasses again exercised their right of first refusal. (Pl.'s FF&CL 6 ¶ 29; Def.'s FF&CL 12; Ex. 13.)

III

A

The Dukart Agreement included two conditions to closing relevant here: (1) that the Skylasses not exercise their right to buy the restaurants and (2) that there be no threatened or pending litigation against the Agreement or the underlying transaction.

9

*See* (Ex. 10 §§ 5.2, 7.2, 7.10).  Rather than have all closing conditions apply generally,

however, the Dukart Agreement divided them into Purchaser's conditions and Seller's

conditions.

Many conditions exist in both sections and apply to the Purchaser and Seller

equally.  *See, e.g.,* (Ex. 10 §§ 5.2, 7.2.)  The right of first refusal condition, however,

only exists as a Purchaser's condition to closing.  *See* (Ex. 10 § 7.10.)  As written, all

Purchaser's conditions are waivable in the Purchaser's sole discretion:

> SECTION 7 CONDITIONS TO OBLIGATIONS OF PURCHASER. The
> obligations of PURCHASER to consummate the transactions provided for
> herein are subject to the following conditions any of which PURCHASER
> may, but need not, in PURCHASER'S sole discretion, waive…

(Ex. 10 § 7.)   The right of first refusal condition provides:

> Right of First Refusal.  GNS Enterprises [6], LP shall not have exercised
> its rights pursuant to and in accordance with the terms of the Right of
> First Refusal contained in [the 2019 Skylass Agreement].

(Ex. 10 § 7.10).  The Dukarts argue they waived Section 7.10's condition to closing,

making the Skylasses' exercised right of first refusal immaterial to the Dukart

Agreement and obligating Baim to sell them the restaurants.  (Def. FF&CL 18.)

Baim argues Section 7.10 is not waivable by the Dukarts; that the Court should

ignore Section 7's introductory clause.  *See* (Pl.'s FF&CL 11 ¶ 22).  He contends the

Dukarts' exclusive right to waive the right of first refusal closing condition was merely

an oversight.  (Oral Arg. Tr. 21:16–24.)  The evidence, testimony and totality of the

circumstances all support Baim's position but, for the reasons discussed herein, the

Court need not resolve that issue.

Baim separately argues Skylasses' lawyers' emails threatening litigation

violated necessary conditions to closing, Sections 5.2 and 7.2.  *See* (Pl.'s FF&CL 10 ¶

17, 11 ¶ 19; Ex. 8, 13).  These identical provisions appear as Seller's and Purchaser's conditions:

> <u>Challenge to This Agreement</u>.  There shall be no pending or threatened claim and/or suit by any party challenging this AGREEMENT or the consummation of the transactions contemplated herein.

(Ex. 10 § 5.2; 7.2).  Unlike the right of first refusal condition, the existence of threatened litigation could only be waived by mutual consent because the condition applies equally to Purchaser and Seller.

The testimony and other record evidence showed that the Skylasses threatened to challenge the agreement between Baim and Dukart. In the Dukart Agreement, however, Baim represented that there was no threatened litigation at the time of signing:

> <u>Litigation</u>.  Except as listed on <u>Exhibit F</u> attached hereto: . . . There is no investigative action, inquiry, proceeding or litigation pending, or to the best knowledge of SELLER . . . threatened, against SELLER . . . or the RESTAURANTS before any court. . . . [SELLER does not know] of the occurrence of any events which are likely to give rise to any such action, proceeding or investigation.

(*Id*. at § 4.1). Exhibit F was blank and was never amended. (*Id*. at Ex. F).

B

On October 29, 2020, Skylasses' attorney Socrates Georgeadis emailed Baim's lawyer, Daniel Dugan, stating: "[i]f we can't resolve this dispute and get reasonable assurances that your client intends to honor our client's contractual rights, we intend to seek redress in court." (Ex. 8.)  In fact, the Skylasses retained Zachary Glaser, described as "litigation counsel," to seek to enjoin any deal between Baim and the Dukarts which would impede the Skylasses' ability to exercise their right of first

refusal and buy the Philadelphia restaurants.  (Pl.'s FF&CL 5 ¶ 20.)  Glaser testified that his office began drafting a complaint.  (Trial Tr. Day 1 109:17–20; Pl.'s FF&CL 5 ¶ 20; Def.'s FF&C: 10.)

Glaser and Dugan exchanged emails during the October 30 meeting and conference call.  Glaser reiterated the Skylasses' threat to litigate, reminding Dugan they were "fully prepared to seek specific performance in court if necessary."  (Ex. 13.)  At 4:39 p.m., Dugan sent Glaser the signed Dukart Agreement and told Glaser they also sent the Agreement to McDonald's Corporate Offices for approval.  (Trial Tr. Day 1 55:8–10; 56:15–22; Pl.'s FF&CL 6 ¶ 29; Def.'s FF&CL 10; Ex. 12, 13.)

On November 3, Glaser, still threatening to go to court, told Dugan his clients were ready to match the Dukarts' terms and buy the Philadelphia restaurants.  (Pl.'s FF&CL 6 ¶ 29; Ex. 13.)  Baim and the Skylasses, through their respective entities, signed a Purchase and Sale Agreement for the Philadelphia restaurants on November 9 (the "2020 Skylass Agreement").  (Trial Tr. Day 1 40:6–41:21; Pl.'s FF&CL 7 ¶ 31; Def.'s FF&CL 12; Ex. 14.)  Baim sold GNS Inc. the restaurants on December 21.  *See* (Ex. 14 § 1.1.)

## Conclusions of Law

### I

Under the Dukart Agreement, Baim was required to sell the brothers the Philadelphia restaurants if certain conditions precedent were satisfied.  *See Acme Markets, Inc. v. Fed. Armored Exp., Inc.*, 648 A.2d 1218, 1220 (Pa. Super. Ct. 1994).  One of those conditions was that there was no pending or threatened claim challenging the Agreement or consummation of the transaction it contemplated.  (Ex. 10 §§ 5.2, 7.2.)

12

The goal of contract interpretation is to determine the parties' intent as expressed in the contract's language. *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983). If that language is clear and unambiguous, courts must give effect to its plain meaning. *Prudential Prop. and Cas. Ins. Co. v. Sartno*, 903 A.2d 1170, 1174 (Pa. 2006); *Murphy v. Duquesne Univ. of The Holy Ghost*, 777 A.2d 418, 430 (Pa. 2001). Extrinsic evidence of a contract's meaning can be considered only when its terms are ambiguous—that is, reasonably susceptible to different interpretations. *Murphy*, 777 A.2d at 429–430; *Trombetta v. Raymond James Fin. Servs., Inc.*, 907 A.2d 550, 562 (Pa. Super. Ct. 2006). "Parol evidence is admissible to explain or clarify or resolve [an] ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic collateral circumstances." *Yocca v. Pittsburgh Steelers Sports, Inc.,* 854 A.2d 425, 437 (Pa. 2004).

Under Pennsylvania law, courts cannot assume contractual language was chosen carelessly or the parties ignored its meaning. *Kmart of Pennsylvania, L.P. v. MD Mall Assocs., LLC*, 959 A.2d 939, 944 (Pa. Super. Ct. 2008). Nor can they imply contracts at odds with their language. *See Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986) (citing 11 Williston on Contracts § 1295 (3d ed. 1968)). Rather, they must interpret contracts to give effect to all their provisions. *Commonwealth ex rel. Kane v. UPMC*, 129 A.3d 441, 464 (Pa. 2015). In doing so, however, courts should "avoid constructions of contracts that would render promises illusory because such promises cannot serve as consideration for a contract." *Hampton Gardens Assocs., v. Kearney Bank,* No. CV 16-323, 2016 WL 3576684 at *4 (E.D. Pa. June 29, 2016) (quoting *M&G Polymers USA, LLC v. Tackett*, 547 U.S. 427, 440 (2015)).

II

The Skylasses threatened to sue to block any transaction that interfered with their right of first refusal on the Philadelphia stores.  On October 29 and 30, their lawyers said they "intend[ed] to seek redress in court" and were "fully prepared" to do so, if necessary.  (Ex. 8, 13.)  Baim argues these threats prevent the conditions to closing in Sections 5.2 and 7.2 from being met. (Pl.'s FF&CL 11 ¶ 19.)

The Dukarts contend that, because Baim did not disclose these threats in Exhibit F under Section 4.1 of the Dukart Agreement, they can't be "threatened litigation" for the purposes of Sections 5.2 and 7.2.[4]  (Def. FF&CL 9; 19; Oral Arg. Tr. 36:5–20.)  Any evidence showing otherwise, they argue, is precluded by the Agreement's integration clause.  (*Id*; Ex. 10 § 11.7.)

They also argue that, even if the Court were to disregard Exhibit F and consider the October 29 and 30 emails, they cannot constitute "threatened litigation" under Section 5.2 because it would "render the contract illusory."  (Def. FF&CL 20.)  To interpret the condition that way, they reason, would make it instantly waivable by Baim.  (*Id*.)  If Baim can back out of the sale at any time, he hasn't provided adequate consideration. (*Id*.)

A

1

Read in isolation, "threatened claim" includes the Skylasses' threats to enjoin the transaction.  When interpreting a contract, however, the Court must do so in a way

---

[4]      Sections 5.2 and 7.2 of the Dukart Agreement are identical and apply to Baim and the Dukarts, respectively.  The Court references Section 5.2 only in its analysis because it applies to Baim.

that comports with the parties' intent and gives meaning to every term.  *See Standard Venetian Blind Co.,* 469 A.2d at 566*; Commonwealth ex rel. Kane,* 129 A.3d at 441.

Exhibit F of the Dukart Agreement, referenced in Section 4.1, represents that no pending or threatened litigation existed at the time of signing.  (Ex. 10 § 4.1.)  Because Exhibit F is blank, the Court cannot interpret the October 29 and 30 emails from the Skylasses' lawyers to be "threatened claims" under Section 5.2.  To do so would put Section 5.2 in conflict with Section 4.1's representations and would render the contract internally inconsistent.  *See Hutchison v. Sunbeam Coal Corp.*, 519 A.2d at 388.

2

Section 5.2 cannot, however, be interpreted as meaningless, nor can the Court presume the parties ignored it.  *Commonwealth ex rel. Kane*, 129 A.3d at 464; *Kmart of Pennsylvania, LP,* 959 A.2d at 944.  To find a meaningful definition of "threatened claims" that comports with the parties' intent and can be consistently applied throughout the Agreement, the Court may look to parol evidence.  *See Yocca,* 854 A.2d at 437.

Baim and the Dukarts began their discussions in the summer of 2020 and signed their Purchase and Sale Agreement on October 30.  Baim told the Dukarts at the outset that the Skylasses had a right of first refusal to buy the Philadelphia restaurants and that if they exercised that right, Baim would have no choice but to sell to them.  *See* (Trial Tr. Day 1 28:20–24; Pl.'s FF&CL 3 ¶ 11; Def.'s FF&CL 2).   Baim was, at all times, up front with the Dukarts about everything.  He told the Dukarts he sent the Revised Letter of Intent to the Skylasses, and they knew all along that if the Skylasses matched their offer, the Skylasses would get the restaurants.  *See* (Trial Tr. Day 2

15

31:20–33:5; Def.'s FF&CL 6).  Indeed, the Revised Letter of Intent, signed by both Dukarts, specifically exempted the Skylasses from its Exclusive Dealing and Confidentiality provisions.  (Ex. 4 at p. 5 ¶¶ 4–5.)

When the Skylasses began to argue over certain terms omitted from the Revised Letter of Intent, Baim found himself in a tough spot.  *See* (Ex. 4.)  Normally, those unspecified terms would be further negotiated by the parties and solidified in a final Purchase and Sale Agreement.  But here, the Skylasses were fighting on terms Baim believed the Dukarts would agree to.  *See* (Trial Tr. Day 1 29:9–22; Def.'s FF&CL 7; Ex. 8).  Baim was being pulled in a few different directions.  He wanted to comply with the 2019 Skylass Agreement, get the best price for his restaurants on the best terms, and submit the transaction for corporate approval so he could sell by year's end.  He decided that his best option was to strike a deal with the Dukarts and send the Dukart Agreement to the Skylasses.

Baim and the Dukarts signed the Dukart Agreement for two reasons:  so the deal could obtain McDonald's approval and be timely finalized, and to compel the Skylasses to exercise their right of first refusal or let the restaurants go to the Dukarts.  (Trial Tr. Day 1 29:5–8.)  While it was certainly the Dukarts' *hope* that the Skylasses would decline to exercise their right, they knew that wasn't guaranteed.  When they testified, the Dukarts tried very hard to avoid admitting these and other material facts.  They were particularly evasive on cross-examination when it came to the topic of threatened litigation.  Despite making his lawyers insist that Baim defend and indemnify he and Michael, Joel tried to imply that he relied on Exhibit F's indication that no one (particularly the Skylasses) were threatening to sue.  (Trial Tr. Day 1

16

150:24–160:16.)  The exchange was exasperating to endure and reflected poorly on his credibility.  His brother Michael wasn't any better, dodging straightforward questions so many times the Court had to repeatedly instruct him to answer them.  (Trial Tr. Day 2 26:19–29:13.)  During its third attempt, the Court told him that if he didn't know or remember, he could say so.  He took full advantage of that out and immediately claimed to either not know or remember things that he obviously knew and remembered but didn't want to admit.  (*Id*. at 30:1–16.)

The Dukarts signed their Purchase and Sale Agreement with Baim knowing the Skylasses could exercise their right of first refusal and would sue if that right wasn't honored.  *See* (Ex. 8; 11).  Baim testified that he and the Dukarts executed the Dukart Agreement "in the hopes that Skylass would not be able to secure the financing, number one, or, number two, not meet the date to exercise under the previous agreements."  (Trial Tr. Day 1 29:5–8.)  Joel Dukart, after another prolonged exchange, ultimately admitted that was his understanding too.  When asked whether he understood that sending the Skylasses the Dukart Agreement on October 30 "triggered the time frame for [them] to exercise [their] right of first refusal," he begrudgingly admitted it was "possible."  (*Id*. at 169:10–15.)

Moreover, the Dukarts intended to let the Skylasses buy the restaurants if they exercised their right to do so.  Their lawyer said as much in his October 30 email specifically requiring Baim to pay the Dukarts a "breakup fee in an amount to be mutually agreed upon by Baim and Dukart" if Baim sold the restaurants to the Skylasses.  (Ex. 11.)  In fact, Joel and Michael Dukart both revealed that their only real beef with Ed Baim was over the amount of that breakup fee.  Once Joel didn't get the

17

restaurants, he wanted Baim to "do the right thing here" and reimburse the Dukarts for the "nearly 100 grand" they spent developing the now failed deal.  (Trial Tr. Day 1 94:25–95:5; 95:9–10.)  When Baim told him to "take ten grand or do what you got to do, kiddo," that put the parties in their first adversarial posture.  (*Id*. at 95:12–13.)  In retelling that story from the witness stand, Joel's demeanor and tone made it obvious that being treated like a "kid" by old family friend Eddie was more than he was going to take.  (Trial Tr. Day 1 94:3–95:21; 181:24–183:25.)  And Michael Dukart admitted that he and his brother only retained counsel and threatened to sue Baim when they "didn't get a reasonable breakup fee."  (Trial Tr. Day 2 22:21–24.)

Joel Dukart knew the restaurants were the Skylasses' for the taking, admitting he and Michael believed they "[had] nothing" to combat a sale to Skylass.  (Trial Tr. Day 1 195:24–196:11.)  That's why he and Michael insisted on being indemnified if the Skylasses sued them and that's also why they insisted on a breakup fee if they lost the deal.

3

The Skylasses threatened litigation *only if* Baim failed to "honor [their] contractual rights" or refuse to give the Skylasses the deal on "the terms of the Dukart offer."  (Ex. 8; 13.)  The Skylasses only had a claim if Baim either (1) failed to send them a *bona fide* offer, (2) failed to give them 14 days to consider the *bona fide* offer, or (3) failed to honor an exercise of their right.  *See* (Ex. 1 § 10.11).  Absent one of these triggers, the Skylasses had no grounds to challenge the transaction contemplated by the Dukart Agreement.

Prior to the Skylasses' attorney telling Baim's lawyer on November 3 that they wanted to buy the restaurants, the terms of Baim's deal with the Dukarts did not conflict with the Skylasses' right to buy the restaurants.  Baim was "honor[ing]" the Skylasses' rights by conveying to them the terms of the Dukart Agreement.  *See* (Ex. 8.) Once the Skylasses exercised their right of first refusal, selling the restaurants to the Dukarts would have breached the 2019 Skylass Agreement.  As soon as the Skylasses exercised their right, Baim was contractually prohibited from selling the restaurants to the Dukarts.  Doing so would buy a lawsuit from the Skylasses and subject the "transaction contemplated" in the Dukart Agreement to litigation.[5]

This is consistent with all evidence of the parties' intent.  Again, the Dukarts were knowing and willing stalking horses.  They entered into their Agreement with Baim with their eyes wide open, hoping to force the Skylasses' hand.  They knew all along that if the Skylasses matched the terms of their offer (and secured the financing necessary to do the deal), the Skylasses would get the restaurants.  But they wanted to be in the position to acquire the restaurants if the Skylasses did not want to, or could not, do so.  The parties wanted an agreement firm enough that the Skylasses had to decide, but flexible enough to allow them out if he took the deal.  That's why they included the threatened litigation provision as a condition to sale: no one wanted the Skylasses to sue them.  It also explains why the Skylasses' threats to sue before they signed the Dukart Agreement didn't preclude Baim and the Dukarts from doing so:

---

[5]     The Court need not address whether the right of first refusal was actually exercised, properly assigned, or enforceable by the Skylasses.  The parties' intent under the litigation provision was to avoid litigation challenging the sale, and testimony confirmed that, at the time of signing, both parties believed the right of first refusal was enforceable.  *See* (Trial Tr. Day 2 31:20–33:5).

when they signed the Agreement, the Skylasses had yet to decide to match its terms. Unless they did so within 14 days, the Dukarts were entitled to the restaurants. Up and until the Skylasses matched the offer, they could not sue to enforce their rights.

Interpreting Section 5.2 of the Dukart Agreement this way gives meaning to the words "threatened claim" and is consistent with the parties' intent to sign the Agreement, sell the restaurants to the Skylasses if they exercised their right, and avoid litigation.

B

Interpreting Section 5.2 this way does not make the contract illusory. An illusory contract is "[a]n agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation." *Carrone v. UnitedHealth Grp. Inc.,* No. 20-2742, 2021 WL 3520809, at *2 (3d. Cir. Aug. 11, 2021) (citing Black's Law Dictionary (11th ed. 2019)). Absent the Skylasses' decision to buy the restaurants on the Dukarts' terms, Baim was required to sell the restaurants to the Dukarts. Because Baim's "liberty of action was circumscribed" by the Dukart Agreement, it was not illusory. *See* 1 Corbin on Pennsylvania Contracts § 5.10 (2022).

The Skylasses' threats to sue to prevent Baim from selling the Philadelphia restaurants to the Dukarts, as of November 3, 2020, violated a necessary condition to closing, and Baim did not breach his agreement with the Dukarts when he sold the restaurants to the Skylasses.

An appropriate Order follows.

20

BY THE COURT:


***/s/ Gerald J. Pappert***
GERALD J. PAPPERT, J.